1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JUAN POSADAS, | ) | No. C 08-4341 MMC (PR) |
| | ) | |
| Petitioner, | ) | **ORDER DENYING PETITION FOR** |
| | ) | **WRIT OF HABEAS CORPUS;** |
| v. | ) | **DENYING CERTIFICATE OF** |
| | ) | **APPEALABILITY; DIRECTIONS TO** |
| TERRI GONZALEZ, Warden, | ) | **CLERK** |
| | ) | |
| Respondent. | ) | |
| | ) | |

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Juan Posadas, who proceeds pro se and challenges the validity of a judgment obtained against him in state court.  Respondent has filed an answer to the petition, and petitioner has filed a traverse.[1]

## I.  PROCEDURAL HISTORY

In 2004, a Santa Clara County jury found petitioner, with his co-defendant Maurice A. Vasquez ("Vasquez"), guilty of possession of a firearm by a felon and kidnapping, the latter with an enhancement for personal use of a firearm.  (CT 273-74, 279.)  Petitioner admitted

---

[1] Petitioner initially named Michael Martel, former warden of Mule Creek State Prison, as the respondent in this action.  The California Department of Corrections online inmate locator service shows plaintiff has been transferred to California Men's Colony ("CMC").  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Terri Gonzalez, the current warden of CMC, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.  Petitioner is reminded he must keep the Court and all parties informed of any change of address.

having a prior conviction that qualified as both a prior serious felony and a prior strike.  (CT 278-79.)  The trial court sentenced petitioner to a term of twenty-five years in state prison. (CT at 423-26.)

Petitioner directly appealed the judgment in the California Court of Appeal.  In conjunction with the direct appeal, petitioner filed a state petition for a writ of habeas corpus. (Ex. 5.)[2]  Petitioner's co-defendant, Vasquez, similarly filed a direct appeal and habeas petition, and the Court of Appeal consolidated their actions.  (Ex. 6.)  On April 25, 2007, the Court of Appeal affirmed the judgments against both petitioner and Vasquez, and denied their habeas petitions.  (Ex. 6.)  On May 17, 2007, the Court of Appeal denied a petition for rehearing and ordered various modifications be made to the original opinion, none of which altered the judgment against either petitioner or his co-defendant.  (Ex. 7.)

On August 8, 2007, the California Supreme Court summarily denied petitioner's petitions for review as filed in both the case on direct appeal and the habeas case.  (Exs. 8-11.)

On September 16, 2008, petitioner filed the instant petition for a writ of habeas corpus.

## II.  STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

*A. Introduction*

The jury found defendants guilty of kidnapping Guillermo Velasquez (Victim). Victim's story was that defendants had stopped him on the road, forced him at gunpoint out of his car, bound his hands, and then forced him into their car and drove away.  During the short drive that followed, [petitioner] held a gun pointed at Victim's rib cage and told him he wanted him to "cooperate." Before they had driven very far the car got stuck in the mud.  Defendants ordered Victim out of the car and he managed to escape by running away through an orchard where he encountered a husband and wife at their residence and prevailed upon them to call 911.  Victim claimed he had no idea why [petitioner] and Vasquez had kidnapped him.

---

[2]  All references herein to exhibits are to exhibits submitted by respondent in support of the Answer.

United States District Court
For the Northern District of California

The prosecution's theory revolved around the fact that [petitioner] was a confidential informant for the Bureau of Narcotics Enforcement (BNE). The prosecution argued that [petitioner] was afraid that Victim had discovered he was an informant and, therefore, [petitioner] and Vasquez planned to kill him so that he would not reveal that [petitioner] was an informant. The defense argued that Victim was a drug dealer who had got into the car to negotiate a drug deal, that he was the one with the gun, and that when the car got stuck he ran away and made up the story about the kidnapping.

*B. The Prosecution's Case*

Victim was the prosecution's first witness. He testified through a Spanish language interpreter. Victim testified that he had met [petitioner], whom he knew as "Shorty," while the two were in jail in 2000. Victim was then serving a six-month sentence for perjury. After his release, Victim worked for [petitioner's] uncle for a few months doing landscaping. Victim had met [petitioner] on a few other occasions, as well.

[Petitioner] was a confidential informant working with BNE agents Eduard Heredia and Mitchell Fox. [Petitioner] had an extensive knowledge of the world of narcotics and methamphetamine. He first began supplying information to BNE in order to "work off a criminal case." Thereafter, he continued to supply information for cash. Heredia and Fox considered [petitioner] to be a reliable informant. On about eight to 10 occasions they had obtained search warrants in response to information [petitioner] had given them. On each occasion the agents uncovered large quantities of illegal drugs, mostly methamphetamine. Altogether, [petitioner's] tips led to the discovery and seizure of hundreds upon hundreds of pounds of methamphetamine. By the time of the incidents alleged in this case the BNE had paid [petitioner] about $30,000 for his information.

[Petitioner] did not work under the direction of the BNE agents but tended to work on his own, gathering information. The BNE never authorized him to buy or sell drugs in order to obtain information. If [petitioner] had engaged in any such transactions, it was without the knowledge of the BNE and would have subjected him to criminal penalties had his conduct been discovered by law enforcement. It was understood that the informant's identity was to remain confidential to protect both the integrity of the criminal investigations and the safety of the informant.

In or about 2001, [petitioner] told Heredia and Fox that Victim was distributing methamphetamine and was planning to manufacture it at the trailer in which he lived in a remote area of Morgan Hill. BNE investigated and learned that Victim associated with or was related to persons known to be involved in the manufacture or sale of methamphetamine. The agents also observed Victim's trailer and determined that it was located in a logical spot for setting up a clandestine methamphetamine laboratory.

In early 2003, [petitioner] and Victim drove to Fremont to meet with [petitioner's] father about landscaping work for Victim. While they were stopped a short way from their destination, a law enforcement officer approached them and searched them for narcotics. The anticipated meeting with [petitioner's] father never took place.

3

According to his testimony at the preliminary hearing, Victim's contacts with [petitioner] had mostly involved either the effort to obtain work or [petitioner's] interest in buying one of the goats Victim tended at the property where the trailer was located. Victim later recalled that shortly after the trip to Fremont, he had called [petitioner] to try and sell him his truck. Victim claimed that he wanted to buy a taco truck and that he needed to sell his pickup truck to pay for it. Victim made about 40 calls to [petitioner] for this purpose, 29 of those calls were made in one day on February 20, 2003.

On February 27, 2003, agent Fox and a team of law enforcement officers executed a search warrant for Victim's trailer. They uncovered nothing other than some old marijuana that Victim's aging uncle used to make a potion to rub on his joints. There was no methamphetamine and nothing to suggest that the trailer had been or was being prepared to be a methamphetamine laboratory. This was the first time Heredia and Fox had obtained a search warrant based upon a tip from [petitioner] and had not found what they were looking for.

On March 15, 2003, 16 days after the fruitless search of Victim's trailer, Victim was returning home around 6:00 or 7:00 p.m. when he saw defendants' car coming toward him. Defendants stopped their car and waved at Victim to stop, which he did. Defendants got out of their car and told Victim to come with them. Victim refused and defendants each took out a gun. [Petitioner] told Victim that Vasquez was with law enforcement. [Petitioner] reached in, turned off Victim's truck, and took the keys out of the ignition. Victim exited his truck and was told to get down on his knees. Vasquez removed Victim's belt and bound Victim's hands behind him with the belt. Defendants then ordered Victim into their car and they drove off. Victim's cell phone was left behind in his truck. Victim was in the back seat with [petitioner], who held a gun to Victim's ribs. [Petitioner] told him he wanted him to cooperate. He asked Victim why he was so scared and told him he would not be the first person he had killed.

Vasquez, who was driving, missed the ramp to the freeway and, while attempting to make a U-turn on the road that runs behind Live Oak High School, drove the car into a ditch where it got stuck. Just before getting stuck, defendants had thrown Corona beer bottles out of the car. With the car in the ditch, the trio got out and Vasquez ordered Victim to go stand by the orchard on the side of the road opposite the high school. Victim backed away toward the orchard, working his hands free of the belt as he walked. About this time a passing car had stopped by the stranded vehicle. Vasquez tucked his gun into his waistband. When he turned away from where Victim was now standing, Victim turned and ran into the orchard, by now holding his belt in his hands.

Victim soon came to a trailer where Maria Yañez was just driving up in a car. Mrs. Yañez testified that Victim had a belt in his hands. He told her that three men were chasing him with guns and asked her to call the police. She was afraid and told Victim to go talk to her husband. Jose Yañez first thought that Victim was drunk or on drugs but soon he understood that he was just "really, really frightened." He stood in the bushes frightened and crying. Mr. Yañez instructed his wife to call the police and then gave the phone to Victim. Victim reported that men were chasing him with guns.

Around the same time, Police Officer Andrew Jackson was patrolling the area around Live Oak High School when he came upon the stranded car and a truck with a winch attempting to pull the car out of the ditch. Vasquez was standing

4

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to one side speaking on a cell phone.  [Petitioner] was pacing back and forth. As Jackson was speaking with the two men a call came over his two-way radio alerting him (and defendants) to the report of a victim being chased by persons with guns.  The description of the suspects and their car matched defendants and the vehicle in the ditch.  Defendants denied any involvement.  [Petitioner] produced a fraudulent driver's license and murmured that he was a BNE agent. Jackson did not know what he was talking about but he could tell [petitioner] urgently wanted to get the information across to him.

Meanwhile, Sheriff's Deputy Jose Zuniga responded to the call from the Yañez residence.  He found Victim "shaking, scared."  He kept repeating, "They're going to get me; they're going to get me."  Zuniga transported Victim to where the car was stranded and Victim identified defendants as his abductors. Jackson observed that Victim had light red linear abrasions on the outside of his wrists and "scuff marks" on the inside.

Defendants were taken into custody.  A search of the area revealed a Colt .45 semiautomatic handgun in an "inside the pants" holster wedged in the fork of a tree in the orchard.  The gun was loaded with a live round in the firing chamber and an extra magazine stored in the holster.  When one officer announced that he had found the gun, another officer observed that defendants "slumped in their seats and slumped their heads and waved their heads."  Prior to that they had been very casual, almost nonchalant.  Three full bottles of beer were found placed along the fence line by the school grounds across the street from the orchard.  Victim's keys were on the console in the front seat of defendants' car. His pickup truck was still parked on the side of the road leading to his trailer. No other gun was found.  Police activated a recording system in the police vehicle in which defendants had been placed.  The tape picked up the sound of defendants whispering to each other but much of the tape was unintelligible.

*C. The Defense Case*

[Petitioner] did not testify at trial; Vasquez did.  Vasquez testified that he ran an "escort service" and had arranged for some girls to meet with [petitioner] and Victim on the night of March 15, 2003, around 7:00 p.m.  Vasquez and [petitioner] drove to Victim's trailer and when he was not there they turned around and were driving away when they saw his pickup truck approaching. They all stopped.  Victim left his truck and got into the car in the front seat and threw his keys on the console.  Victim and [petitioner] talked together in Spanish.  Vasquez could only understand a little bit of what they said but he did understand [petitioner] to ask, "[W]hy do you only have two ounces" to which Victim responded, "later" and "I want to see some money."  Vasquez identified the Colt .45 holster as the holster Victim had been wearing that night.

According to Vasquez, when the car got stuck in the ditch, Victim got out, grabbed three beer bottles, walked across the street to the fence, and looked around.  Then he walked back across the street to the side where the orchard was.  Meanwhile, a passerby had stopped to help and, after sizing up the situation, left to get a friend who had a truck with a winch.  When the person returned and Vasquez began talking with him, Victim looked agitated and then just darted off.

Rebecca Serrato, one of Vasquez's girlfriends, testified that she and two friends had planned to meet Vasquez and two of his friends at a hotel in San Martin, California, on the night the alleged kidnapping took place.  She was not sure of

the exact time they were supposed to meet but it was "[b]etween 7:00 or something like that." Serrato had not yet left Sacramento when she learned that meeting would not take place. Serrato admitted to being close to Vasquez and having visited him many times in jail. The most recent visit was just two days before her testimony.

(Ex. 6 at 2-8.)

## III. DISCUSSION

A.   Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict."  Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal quotation and citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because

6

1   that court concludes in its independent judgment that the relevant state-court decision applied

2   clearly established federal law erroneously or incorrectly.  Rather, that application must also

3   be unreasonable." Id. at 411.

4          Section 2254(d)(1) restricts the source of clearly established law to the Supreme

5   Court's jurisprudence.  "[C]learly established federal law, as determined by the Supreme

6   Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme]

7   Court's decisions as of the time of the relevant state-court decision." Id. at 412.  "A federal

8   court may not overrule a state court for simply holding a view different from its own, when

9   the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540

10  U.S. 12, 17 (2003).

11         Here, as noted, the California Supreme Court summarily denied petitioner's petitions

12  for review.  (Exs. 8-11.)  The Court of Appeal, in its opinion on direct review, addressed four

13  of the six claims petitioner raises in the instant petition.  (See Ex. 6.)  The Court of Appeal

14  thus was the highest court to have reviewed those claims in a reasoned decision, and, as to

15  those claims, it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v.

16  Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th

17  Cir. 2005).  As to the claims for which there is no reasoned opinion available, the United

18  States Supreme Court has recently clarified that a federal habeas court, in applying the

19  review provisions of 28 U.S.C. § 2254(d), looks to the result reached by the highest state

20  court, and the absence of reasoning does not prevent application of the standard of review set

21  forth in § 2254(d).  See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

22  B.     Petitioner's Claims

23         Petitioner asserts the following grounds for relief: (1) the trial court erred in allowing

24  evidence of a threat directed toward the victim by Vasquez; (2) the trial court did not allow

25  petitioner to cross-examine the victim with respect to the victim's purported involvement in a

26  1993 drug sale; (3) the trial court did not allow petitioner to cross-examine the victim with

27  respect to the victim's 1989 falsification of a social security application; (4) petitioner was

28  denied effective assistance of trial counsel; (5) the Court of Appeal engaged in fact-finding;

United States District Court

For the Northern District of California

7

and (6) cumulative error.  The Court addresses each claim in turn.

     1.     <u>Admission of Evidence of Threat by Vasquez</u>

     Petitioner claims the trial court erred in permitting the prosecutor to ask Vasquez a question about a statement he purportedly made, threatening the victim.  Petitioner additionally claims the prosecutor committed misconduct in asking the question.

     The Court of Appeal provided the background for this claim as follows:

> At the very end of the evidence phase of the trial, the prosecutor asked Vasquez a series of questions concerning his conversation with [petitioner] in the back of the police cruiser on the night of their arrest.  The prosecutor did not seek to admit the tape or the transcript of that conversation but cross-examined Vasquez based upon the transcript.  Vasquez admitted saying to [petitioner], "What the fuck did this mother fucker run for" and "I think they think that gun was ours" and other comments that were not particularly incriminating.  The prosecutor followed this line of questioning with this question: "When you were in the proximity of [petitioner], at some point you said, 'If I get out on Friday, the victim's dead on Sunday'; is that correct?"  Defendants objected to the question and the court sustained the objection "at this time."

> The statement the prosecutor attributed to Vasquez was not taken from his taped conversation with [petitioner].  Rather, Deputy District Attorney Vonda L. Tracey had filed a declaration in connection with a bail hearing, which stated: "On March 19, two California Department of Justice Agents contacted me.  They informed me that they had visited [petitioner] in jail on an unrelated case.  During their conversation, [petitioner] relayed that his Codefendant, Vasquez, had stated that if he (Vasquez) gets out on Friday, [the victim] won't be around by Sunday."  The agents to whom the declaration referred were presumed to be Heredia and Fox.

> The admissibility of the statement had been raised during in limine motions.  The court noted then that the issue was moot unless "defendant chooses to testify. . . . [¶] So the Court's ruling is that no mention be made of these, obviously in opening statement or at any other time unless the defendant testifies.  Should the defendant testify and [the prosecutor] determines that he believes that this evidence is now relevant and admissible, he'll notify the Court first and then we'll deal with the [Evidence Code section] 402 hearings."

> Following defendants' objection to the question, the matter was discussed out of the presence of the jury and an Evidence Code section 402 hearing was held in which Vasquez denied having made the statement.  The prosecutor acknowledged that he could not prove the contrary without violating [petitioner's] confrontation rights.  The trial court concluded that even though the statement involved multiple levels of hearsay, the prosecutor seemed to have a reasonable basis for it.  The court allowed the question so long as the prosecutor avoided mentioning [petitioner] by name.

> When the jury returned, the prosecutor asked Vasquez whether he had realized that it was Victim who had accused him of a crime.  Vasquez admitted that he had and that he had been angry about that.  He also admitted whispering about Victim to [petitioner] as they sat in the back of the patrol car.  The prosecutor

United States District Court

For the Northern District of California

1    then asked, "At any point had you ever said that if you get out of jail on Friday,
2    the victim would not be around by Sunday." Vasquez denied having made the
     statement and the prosecutor terminated his cross-examination. After four brief
     questions from defense counsel, the evidence phase concluded.

3    (Ex. 6 at 8-10.)

4        The Court of Appeal held either version of the question was improper under

5    California law because the questions "implied the existence of a harmful fact that the

6    prosecutor was unable to prove." (Ex. 6 at 10.) The Court of Appeal also noted the

7    prosecution's first question was in violation of "the trial court's in limine ruling . . . [and]

8    was clearly misconduct," and "[t]he trial court compounded the error by permitting the

9    revised version" of the question. (Id. at 11.) The Court of Appeal, however, did not

10   explicitly decide whether the error was simply a state law evidentiary violation – which,

11   under People v. Watson, 46 Cal. 2d 818, 836 (1956) would require reversal unless the error

12   was harmless – or a violation of Petitioner's Sixth Amendment rights – which, under the

13   more rigorous standard of Chapman v. California, 386 U.S. 18, 24 (1967), would require

14   reversal unless the error was shown to be harmless beyond a reasonable doubt. (Id. at 10.)

15   Instead, the Court of Appeal presumed a violation of defendants' Sixth Amendment rights

16   and applied the more rigorous Chapman standard. (Id. at 13-15.) The Court of Appeal

17   concluded any error caused by the prejudicial questioning was harmless beyond a reasonable

18   doubt. (Id.)

19            a.      Confrontation Clause

20       Petitioner claims the trial court's ruling, allowing the prosecutor to ask the question a

21   second time, violated his Sixth Amendment rights under the Confrontation Clause.

22       The Confrontation Clause of the Sixth Amendment provides that, in criminal cases,

23   the accused has the right to "be confronted with the witnesses against him." U.S. Const.

24   amend. VI. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence,

25   but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S.

26   36, 61 (2004). "It commands, not that evidence be reliable, but that reliability be assessed in

27   a particular manner: by testing in the crucible of cross-examination." Id.; see Davis v.

28

1    Alaska, 415 U.S. 308, 315-16 (1974) (noting "a primary interest" secured by the

2    Confrontation Clause "is the right of cross-examination").  The right to cross-examine, as

3    guaranteed by the Confrontation Clause, provides the opportunity to "expose to the jury the

4    facts from which jurors . . . could appropriately draw inferences relating to the reliability of

5    the witness." Davis, 415 U.S. at 318.

6         The Confrontation Clause applies to all "testimonial" statements.  Crawford, 541 U.S.

7    at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the

8    purpose of establishing or proving some fact." Id. at 51 (internal quotation and citation

9    omitted).  The Confrontation Clause is satisfied when the declarant is available at trial and

10   subject to cross-examination.  See Crawford, 541 U.S. at 59 n.9 ("The Clause does not bar

11   admission of a statement so long as the declarant is present at trial to defend or explain it.")

12        "Confrontation Clause violations are subject to harmless error analysis." United

13   States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004); see also United States v. Allen, 425

14   F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the standard

15   is whether the allegedly inadmissible evidence had "'substantial and injurious effect or

16   influence in determining the jury's verdict.'" See Hernandez v. Small, 282 F.3d 1132, 1144

17   (9th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); Webb v. Lewis,

18   44 F.3d 1387, 1393 (9th Cir. 1994) (same).

19        Petitioner's claim is without merit.  As discussed above, Vasquez was the declarant of

20   the out-of-court statement at issue and was a witness on the stand at the times the prosecutor

21   asked the questions concerning the statement.  The prosecutor asked Vasquez, "At any point

22   had you ever said that if you get out of jail on Friday, the victim would not be around by

23   Sunday?" (RT 722.)  The question asks only about a statement by Vasquez.  It does not refer

24   to a statement by any other person.  Vasquez testified at trial and was subject to cross-

25   examination by petitioner.  Consequently, there was no violation of the Confrontation

26   Clause.  See Crawford, 541 U.S. at 59 n.9.

27        Even assuming either question violated petitioner's Sixth Amendment rights, which

28   they did not, petitioner fails to show the result of the proceedings would have been different

United States District Court

For the Northern District of California

1   had the questions not been asked.

2       First, the prosecution had a strong case, supported, as the Court of Appeal noted, by

3   significant physical evidence.  For example, the fact that the victim's pickup truck was left,

4   unlocked and with his cell phone in it, on the side of the road as opposed to up the hill at the

5   trailer where he lived, all indicate the victim did not voluntarily leave his truck.  Similarly,

6   the fact that the keys to the victim's truck were left on the dashboard of petitioner's car,

7   supports the prosecution's theory that the victim, fearing for his life, fled from the car when

8   the opportunity arose.  Further, the fact that the victim had abrasions on his wrist is consistent

9   with his testimony that his hands were bound, and three other witnesses testified the victim

10  was pleading for help and shaking with fear, all such evidence supporting the prosecution's

11  theory that the victim had been kidnapped.

12      Further, the first time the question was asked, an objection was sustained, and,

13  consequently, no evidence was introduced on the subject by reason of such question; the

14  second time the question was asked, Vasquez denied making the statement.  The trial court

15  instructed the jury, twice, that statements of attorneys are not evidence.  (RT 35, 746.)  The

16  trial court also instructed the jurors that questions are not evidence, and instructed them not

17  to assume to be true any insinuation suggested by a question.  (RT 35, 747.)  Additionally,

18  the court's instructions were underscored by Vasquez's own counsel in closing argument.

19  (See RT 836-37) (pointing out jurors cannot infer anything from prosecutor's challenged

20  questions).  Jurors are presumed to understand and follow instructions.  See, e.g., McKenzie

21  v. Risley, 842 F.2d 1525, 1533 & n.16 (9th Cir. 1988).  In sum, it cannot be said the

22  questions "had substantial and injurious effect or influence in determining the jury's verdict."

23  Brecht, 507 U.S. at 637.

24      Accordingly, petitioner is not entitled to habeas relief on this claim.

25          b.   Prosecutorial Misconduct

26      Petitioner claims the prosecutor engaged in misconduct by asking the initial version of

27  the question without first notifying the trial court as instructed during the hearing on motions

28  in limine.

11

United States District Court

For the Northern District of California

1    Prosecutorial misconduct is cognizable in federal habeas corpus; "the appropriate

2  standard of review for such a claim . . . is the narrow one of due process, and not the broad

3  exercise of supervisory power." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal

4  quotation and citation omitted).  A defendant's due process rights are violated when a

5  prosecutor's misconduct renders a trial "fundamentally unfair." Id.; Smith v. Phillips, 455

6  U.S. 209, 219 (1982) (noting, "the touchstone of due process analysis in cases of alleged

7  prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

8  Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the

9  next question is whether such conduct "infected the trial with unfairness." Tan v. Runnels,

10  413 F.3d 1101, 1112 (9th Cir. 2005).  In particular, a prosecutorial misconduct claim is

11  decided by "examining the entire proceedings to determine whether the prosecutor's remarks

12  so infected the trial with unfairness as to make the resulting conviction a denial of due

13  process." Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation and

14  citation omitted).

15    Here, even accepting the Court of Appeal's conclusion that the initial question was

16  improper, there is no showing the result of the proceedings would have been different had the

17  question not been asked in advance of the trial court's approval.  As discussed, the trial court,

18  upon reconsideration, did give its approval.  Moreover, as also discussed, the prosecution had

19  a strong case, and the jury was instructed that questions themselves are not evidence.  In

20  short, it cannot be said the "prosecutor's remarks so infected the trial with unfairness as to

21  make the resulting conviction a denial of due process." See Johnson, 63 F.3d at 929.

22    Accordingly, petitioner is not entitled to habeas relief on this claim.

23    2.    Exclusion of Evidence of 1993 Drug Sale

24    Petitioner claims the trial court erred in excluding impeachment of the victim in the

25  form of evidence about a 1993 incident in which the victim participated in the sale of drugs.

26  The Court of Appeal summarized the background of this claim as follows:

27        Victim had previously been charged with a Health and Safety Code violation
          that carried an enhancement for conspiring to sell more than one kilogram of
28        cocaine base. (Health & Saf.Code, § 11370.4, subd. (a).)  At a preliminary

12

hearing in 1994, BNE investigating officer, Randolph Blum, testified that he met Victim at an auto body shop on March 17, 1993, to arrange the purchase of two kilograms of cocaine at $17,000 per kilogram and also to buy Victim's Ford Mustang.  According to Blum, Victim agreed to sell the cocaine on a specified future date.  Victim produced 0.55 grams of cocaine and gave it to [an] informant who was acting as a translator.  Indeed, the entire conversation between Victim and Blum was conducted through a confidential BNE informant.  Blum spoke a little Spanish and understood the words "cocaine," "sale," and the weight under discussion.  At the close of the preliminary hearing, the magistrate refused to order the prosecution to identify the informant.  The charges against Victim were eventually dismissed.

Defendants wanted to introduce the transcript of the 1994 preliminary hearing to impeach Victim at trial and also to show that Victim was involved with a drug-trafficking organization.  Blum was in Iraq and unavailable to testify.  The prosecution objected to the evidence, arguing, among other things, that the interpreter's statements to Blum added a layer of hearsay.  The trial court conducted an Evidence Code section 402 hearing at which Victim testified that he was once "involved with drugs, something like that."  He admitted giving cocaine to someone.  A person named "Joe" who worked at the auto body shop was interpreting for him.  Victim did not remember if he gave the cocaine to Joe or to "the other guy."  Victim got the cocaine from his uncle, Valencia Guadalupe, who instructed him to give it to this other person.

The trial court permitted the defense to ask Victim if he had given cocaine to a person in 1993 but refused to allow the preliminary hearing transcript into evidence, finding it contained no foundation for the skill or reliability of the interpreter.  The court also reasoned that the evidence was "unduly time-consuming, prejudicial, misleading – not prejudicial, but confusing to the jury and perhaps misleading them as to what the issue is that they're supposed to decide."

(Ex. 6 at 15-16.)

Petitioner claims the trial court's ruling violated his rights to due process and

confrontation.  The Court of Appeal rejected such claims as follows:

In the present case, the interpreter's reliability was not evaluated at the preliminary hearing.  The interpreter did not testify and there was no inquiry into his language ability, his relationship with Victim, or the circumstances surrounding his involvement in the case.  Thus, the trial court had no way to evaluate whether the interpreter could be considered simply a language conduit. Furthermore, the trial court was reasonably concerned about confusing the issues.  The excluded evidence coincidentally involved another BNE confidential informant who served as an interpreter for Victim.  Victim had not been convicted of any crime related to the alleged transaction and there was no other corroboration of the facts the evidence was designed to prove.  Thus, the jury could well have focused upon issues relating to the informant or wondered why no evidence of a conviction was ever produced.

. . .

The evidence in question was not such that its exclusion significantly altered the jury's view of the witness.  The trial court permitted evidence that Victim

13

United States District Court

For the Northern District of California

1   had been involved in illegal drug activity.  The BNE officer testified that
2   Victim was known to be associated with persons involved with the
    manufacture or sale of methamphetamine, the court allowed defendants to ask
3   Victim if he furnished cocaine to someone in 1993, Victim admitted having
    done so, and the court allowed evidence of Victim's recent perjury conviction.
4   Thus, the jury was not deprived of evidence to show that Victim could have
    been involved in large drug sales or of evidence to impeach his credibility.
5   Evidence of the alleged size of the 1993 transaction would not have provided a
    significantly different impression of the witness.

6   (Ex. 6 at 18-19.)

7                          a.    Due Process

8          "State and federal rulemakers have broad latitude under the Constitution to establish

9   rules excluding evidence from criminal trials."  Holmes v. South Carolina, 547 U.S. 319, 324

10  (2006) (internal quotation and citation omitted); see also Montana v. Egelhoff, 518 U.S. 37,

11  42 (1996) (holding due process does not guarantee defendant right to present all relevant

12  evidence).  Such latitude is limited, however, by a defendant's constitutional rights to due

13  process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.

14  See Holmes, 547 U.S. at 324.

15         In deciding whether the exclusion of evidence violates the due process right to a fair

16  trial or the right to present a defense, the court balances the following five factors: "(1) the

17  probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it

18  is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or

19  merely cumulative; and (5) whether it constitutes a major part of the attempted defense."

20  Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004) (citing Miller v. Stagner, 757 F.2d 988,

21  994 (9th Cir. 1985)).  The court also must give due weight to the state interests underlying

22  the state evidentiary rules on which the exclusion was based.  See Chia, 360 F.3d at 1006;

23  Miller, 757 F.2d at 995.  Here, under the applicable Miller factors, the exclusion of the

24  transcript of the 1994 preliminary hearing did not violate petitioner's due process rights.

25         Petitioner apparently sought to introduce the transcript to impeach the victim and to

26  show the victim was involved in drug trafficking.  The first Miller factor, probative value,

27  arguably weighs in favor of admissibility because evidence of the victim's involvement in a

28  prior drug sale would have placed his credibility at issue and would have bolstered

                                              14

petitioner's defense that the victim was a drug dealer who had voluntarily entered petitioner's car to negotiate a drug deal. This factor, however, is heavily outweighed by the other four factors.

Reliability, the second <u>Miller</u> factor, weighs against admissibility for at least two reasons. First, the reliability of the interpreter who facilitated the conversation between the victim and Blum was never evaluated; thus there was no way for the jury to know whether the actual conversation was consistent with the victim's statements as translated. Second, as noted by the Court of Appeal, the victim was not convicted of any crime related to the alleged transaction, and there was no other corroboration of the facts the evidence was offered to prove.

The third <u>Miller</u> factor, whether the evidence is capable of evaluation by the trier of fact, weighs against admissibility for the same reasons. The jury would have no information from the translator or Blum nor any information as to why there was no evidence of conviction. This lack of context would leave many questions unanswered.

The fourth <u>Miller</u> factor, whether the detail was the sole evidence on the point petitioner wanted to show, weighs against admissibility. As discussed, petitioner sought to introduce the evidence to impeach the victim and to expose him as someone with experience in drug sales. As found by the Court of Appeal, petitioner was able to introduce ample other evidence on these points. Specifically, BNE officer Heredia testified the victim was known to be involved in a criminal organization[3], the trial court allowed defendants to ask the victim if he furnished cocaine to someone in 1993 and the victim admitted having done so[4], and the trial court allowed evidence of the victim's recent perjury conviction[5].

For the same reasons, with respect to the fifth <u>Miller</u> factor, the excluded testimony was not a major part of petitioner's defense. The 1994 transcript was hardly the sole

---

[3] <u>See</u> RT 351-52, 380.

[4] <u>See</u> RT 130-31.

[5] The perjury conviction arose from the victim's falsified application for a California driver's licence in 1997. (RT 66.) The victim was convicted in 2000. (<u>Id.</u>)

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   evidence on the victim's credibility or involvement in drug sales.

2          Finally, as discussed above, the state's case consisted of strong evidence pointing to

3   petitioner's guilt.  Petitioner thus fails to demonstrate the exclusion of the evidence "had

4   substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507

5   U.S. at 637.

6          Accordingly, petitioner is not entitled to habeas relief on this claim.

7                    b.    Confrontation Clause

8          Petitioner's claim that the exclusion of the 1994 transcript limited his cross-

9   examination of the victim – in purported violation of the Sixth Amendment right to

10  confrontation – also fails.  The Confrontation Clause of the Sixth Amendment does not

11  prevent a trial judge from imposing reasonable limits on cross-examination based on

12  concerns as to harassment, prejudice, confusion of issues, witness safety, or interrogation that

13  is repetitive or only marginally relevant.  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

14  While the Confrontation Clause guarantees an opportunity for effective cross-examination, it

15  does not guarantee a cross-examination that is effective in whatever way, and to whatever

16  extent, the defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  Trial

17  judges therefore possess "wide latitude" to impose reasonable limits on cross-examination of

18  witnesses.  See Van Arsdall, 475 U.S. at 679.

19         To determine whether a criminal defendant's Sixth Amendment right of confrontation

20  has been violated by the exclusion of evidence on cross-examination, a court must inquire

21  whether:  "(1) the excluded evidence was relevant; (2) there were other legitimate interests

22  outweighing the defendant's interest in presenting the evidence; and (3) the exclusion of

23  evidence left the jury with sufficient information to assess the credibility of the witness."

24  United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted).  A

25  defendant meets his burden of showing a Confrontation Clause violation by showing "[a]

26  reasonable jury might have received a significantly different impression of [the witness']

27  credibility had [] counsel been permitted to pursue his proposed line of cross-examination."

28  Van Arsdall, 475 U.S. at 680; Slovik v. Yates, 556 F.3d 747, 753 (9th Cir. 2009).

For the reasons discussed above, the Court finds the trial court's ruling precluding admission of the 1994 transcript was reasonable and, if not reasonable, harmless. Although the excluded evidence arguably was relevant, it was reasonable for the trial court to exclude the evidence out of concern that its admission, in the absence of a reliable interpreter, a witness on the stand, or any corroborative evidence such as a conviction, would confuse the issues by creating a mini-trial on the earlier events. Moreover, the record shows the trial court allowed the defense to introduce substantial evidence going to the victim's credibility and involvement in drug sales, including the victim's admission of a drug transaction in 1993. A reasonable jury would not have had a significantly different impression of the victim's credibility if counsel had been allowed to question him about the transcript. See Van Arsdall, 475 U.S. at 680.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

3.   Exclusion of Evidence of Falsification of Social Security Application

Petitioner claims the trial court violated his rights to due process and confrontation in excluding impeachment of the victim in the form of evidence of the victim's false application for a social security card in 1989. The Court of Appeal summarized and rejected this claim as follows:

> A probation report revealed an unadjudicated offense from 1989 in which Victim was accused of obtaining a Social Security card by giving false information. The information had not been disclosed in discovery and the defense sought to introduce it as soon as it was discovered. The trial court determined that the offense was one of moral turpitude but excluded it under Evidence Code section 352. The trial court had allowed the defense to impeach the witness with evidence of his recent perjury conviction. The court explained its ruling on the Social Security card allegation as follows: "But in light of the fact that the perjury conviction itself has been admitted and discussed in front of the jury, I don't think the additional comment that he made a false application for [a] social security card . . . would be sufficiently probative to outweigh the undue consumption of time and confusion that I believe would result from its admission in front of the jury. So on the [Evidence Code section] 352 analysis, that information is deemed inadmissible." This was not an abuse of discretion. Victim's perjury in 2000, for which he was convicted and served time in jail, was potentially far more damning of his credibility than a 15-year-old charge of falsifying a Social Security card application. The evidence was cumulative and the trial court had discretion to exclude it.

(Ex. 6 at 19) (brackets in original).

*United States District Court*
For the Northern District of California

a.     Due Process

Under the applicable <u>Miller</u> factors, discussed above, the exclusion of the social security evidence did not violate petitioner's due process rights.

Petitioner apparently sought to introduce the evidence to impeach the victim.  The first <u>Miller</u> factor, probative value, weighs slightly in favor of admissibility.  While evidence the victim falsified a social security card application would bear on his credibility, the probative value of the evidence at issue here is weakened by the remoteness of the alleged offense as well as the failure to show an adjudication of guilt.  Further, this factor is heavily outweighed by the other four factors.

The second and third <u>Miller</u> factors, reliability and whether the evidence is capable of evaluation by the trier of fact, weigh against admissibility because, as noted, the offense was unadjudicated.  Defendants apparently sought to introduce a probation report that mentioned the victim's having been accused, but not convicted, of the offense, leaving the jury with little information from which to make any evaluation.

The fourth and fifth <u>Miller</u> factors, whether the excluded arrest was the sole evidence on the point petitioner wanted to show and whether such evidence constituted a major part of petitioner's defense, also weigh against admissibility.  As discussed, petitioner sought to introduce the evidence to impeach the victim.  As also discussed, petitioner was able to introduce ample other evidence on this point, specifically, evidence of the victim's recent perjury conviction and evidence of the victim's involvement in drug sales.

Finally, as discussed above, the evidence against petitioner was strong.  The victim's testimony as to the commission of a kidnapping was thoroughly corroborated by objective evidence and independent witnesses' observations.  Petitioner thus fails to demonstrate the exclusion of the evidence as to the application for a social security card "had substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht</u>, 507 U.S. at 637.

Accordingly, petitioner is not entitled to habeas relief on this claim.

b.     Confrontation Clause

Under the principles set out in <u>Beardslee</u> and <u>Van Arsdall</u>, as discussed above,

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   petitioner's claim that the exclusion of the social security evidence limited his cross-

2   examination of the victim – in purported violation of the Sixth Amendment right to

3   confrontation – likewise fails.

4   For the reasons set forth above, the Court finds the trial court's ruling precluding

5   admission of the social security evidence was reasonable, and, if not reasonable, harmless.

6   First, evidence that a probation report showed the victim was accused of falsifying a social

7   security application some 15 years before trial had minimal probative value with respect to

8   his credibility.  Second, it was reasonable for the trial court to exclude the evidence out of

9   concerns as to undue consumption of time and confusion of issues.  Finally, the record shows

10  the trial court allowed the defense to introduce substantial other evidence going to the

11  victim's credibility.  A reasonable jury would not have had a significantly different

12  impression of the victim's credibility if counsel had been allowed to question him about the

13  social security application.  See Van Arsdall, 475 U.S. at 680.

14  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

15      4.   Ineffective Assistance of Counsel

16  Petitioner claims his defense counsel was ineffective for failing to impeach the victim

17  with the tape of the 911 call.  The Court of Appeal summarized and rejected this claim as

18  follows:

19      Defendants point out that during the 911 call, the operator twice told Victim
        that police "already had" the suspects.  Defendants argue that this fact is
20      inconsistent with the evidence supplied by Officer Zuniga, which was that
        when he responded to the Yañez home, after the 911 call was complete, Victim
21      was still "shaking and scared" and kept looking around, repeatedly worrying,
        "They're going to get me."  Defendants argue that Victim's display of fear to
22      Zuniga must have been feigned since Victim would have already been told that
        defendants had been apprehended.  They claim that trial counsel was
23      ineffective for failing to bring this to the jury's attention.

24      Zuniga's observation of Victim at the scene was not recorded in a police report
        so that counsel probably did not anticipate his testimony.  In addition, Zuniga's
25      testimony came after Victim's.  Thus, defendants concede that counsel cannot
        be faulted for failing to pursue the subject in their cross-examination of Victim.
26      As defendants point out, however, Victim was subject to recall so that he could
        have been questioned on the point later in the trial.  According to defendants,
27      counsel should have recalled Victim to the witness stand, questioned him about
        the fact that he had already been told that the suspects had been apprehended
28      when Zuniga interviewed him, and then had the transcript of the 911 call

19

United States District Court
For the Northern District of California

entered into evidence.  Both offer several hearsay exceptions by which the document, or portions of it, would have been admissible.  [Petitioner's] trial counsel does not recall her reasons for not introducing the 911 tape but she does recall that she did not like the fact that the transcript included a statement in which Victim identified [petitioner] by his nickname, "Shorty," as one of the perpetrators.  Vasquez's trial counsel does not address the subject.  We conclude that counsel could have had a rational tactical purpose for failing to pursue this evidence.

Since Victim is a Spanish speaker, the 911 operator was assisted by an interpreter.  During the course of the operator's questioning Victim about the specifics of his report, the interpreter asked him, "Can you see them, yes or no?"  Victim responded, "Yes, I think so."  Then the interpreter said, "Okay. Very good sir.  It seems like we already talking to them [ sic ]," to which Victim responded, "Yes."  After confirming that Victim was inside the trailer from which he had called, the interpreter then told him, "Okay, Sir, just stay there.  We already have them."  These are the statements defendants claim should have assuaged Victim's fears so that the fright he displayed when Zuniga arrived must have been an act.  However, counsel could easily have concluded that the evidence was not as damaging to Victim's credibility as defendants now claim.  If Victim had truly been as frightened as he appeared – Mr. Yañez testified that he was actually crying with fear – he might not have really understood the operator's remarks to mean that he was safe.  That is, the evidence could have cut either way.  If the jury were to interpret it as supporting the finding that Victim was, indeed, afraid for his life, recalling Victim to elicit the testimony could have done more harm than good. Furthermore, other parts of the transcript contain information that would corroborate Victim's story: He told the operator that two men were chasing him, that they were armed, that they had tied him up with a belt, and that one of his abductors was an acquaintance he knew as "Shorty," the name by which he knew [petitioner].  Introducing the entire transcript, as defendants argue counsel should have done, would have put all of this before the jury. It follows that counsels' failure to put this evidence before the jury was not unreasonable.

(Ex. 6 at 26-27.)

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Id. at 687-88.  Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

20

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the Strickland test "if the petitioner cannot even establish incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697.

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under 28 U.S.C. § 2254. See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11 (2011). The general rule of Strickland, i.e., to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). When section 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 131 S. Ct. 770, 788 (2011).

Here, there is ample support for the Court of Appeal's determination that defense counsel made reasonable tactical decisions in declining to pursue the evidence. See Richter 131 S. Ct. at 788. Given all of the circumstances pertaining to the call, the 911 exchange is hardly conclusive evidence that the victim was overreacting or had fabricated his story. Indeed, the introduction of the evidence could well have cemented in the jury's mind evidence that the victim genuinely feared for his life. The decision was a judgment call, and not one that clearly falls below an "objective standard of reasonableness." Strickland, 466 U.S. at 688; see also Brodit v. Cambra, 350 F.3d 985, 994 (9th Cir. 2003) (holding state court reasonably concluded trial attorney provided effective assistance of counsel where attorney declined to present evidence favorable to defense out of concern it would open door to unfavorable evidence).

Accordingly, petitioner is not entitled to habeas relief on this claim.

21

5.      <u>Fact-Finding by Court of Appeal</u>

Petitioner claims the Court of Appeal violated his right to a jury trial in its rejection of his claim on appeal that the trial court erroneously denied petitioner's motion for a new trial. More specifically, petitioner claims the Court of Appeal invaded the province of the jury by engaging in factfinding to resolve the claim.  The Court of Appeal summarized and rejected petitioner's claim that the trial court abused its discretion in denying petitioner a new trial as follows:

> [Petitioner] made a motion for a new trial pursuant to [Penal Code] section 1181, subdivision 8, based upon newly discovered evidence.  The evidence was the testimony of Luis Valencia Mendoza, who had allegedly met [petitioner] while they both were in jail after the jury rendered its verdict in this case.  The witness, who goes by the last name of Valencia, said that he was approached by [petitioner] in jail, who asked him if he was related to Victim.  (Victim's full name is Guillermo Velasquez Valencia.)  Valencia told him that Victim is his first cousin and [petitioner] replied that Victim was the reason [petitioner] was in jail.  He [petitioner] said that Victim had lied in court and accused [petitioner] of having kidnapped him.  It was then that Valencia recalled a conversation he had with Victim in October 2003 in which Victim told him that he owed someone named "Shorty" $30,000.  Victim had asked Valencia if he knew Shorty but Valencia did not.  Victim said, "That's the – I owe him $30,000.  And, I mean, he's all over my nerves.  And I don't know what to do, so I put him in jail."

> Valencia was "middle" close to his cousin, Victim, and had seen him from time to time over the years.  Back in 1996 or 1997, Victim had asked if he wanted to buy a gram of cocaine and gave him prices "from ounces and pounds" of both cocaine and methamphetamine.  Victim also told Valencia he had once been caught selling drugs.  Valencia denied that there were any male family members with the name Guadalupe Valencia, which was the name of the uncle Victim said had given him the cocaine he supplied to BNE Officer Blum in 1993.

> Valencia had been incarcerated on charges of cultivating marijuana when he met [petitioner] in jail in 2005.  He was given probation for the marijuana charge.  He claimed to have had a prior felony conviction for discharging a firearm for which he was then on parole.  He admitted to having been formerly involved in gangs and of having used drugs in the past.

> Valencia had not known [petitioner] prior to meeting him in jail.  He agreed to testify because it seemed to him that [petitioner] was innocent and Valencia was concerned about [petitioner's] family.

> . . .

> In his new trial motion, [petitioner] argued that Valencia's testimony would support the defense theory that the incident that led to his arrest was really a drug deal gone awry and that Victim had concocted the kidnapping story to put [petitioner] in prison.  It also provided further impeachment of Victim.  The

United States District Court

For the Northern District of California

trial court denied the motion.  The court determined that if Victim had concocted the kidnapping story because of money he owed [petitioner], [petitioner] would have known about the debt all along and, in any event, Vasquez had already testified that the entire incident involved a drug deal. [Petitioner] argues on appeal that this ruling was error.

. . .

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328, 19 Cal.Rptr.2d 529, 851 P.2d 811, quoting *People v. Williams* (1988) 45 Cal.3d 1268, 1318, 248 Cal.Rptr. 834, 756 P.2d 221.)  "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." " ' " (*People v. Delgado*, supra, 5 Cal.4th at p. 328, 19 Cal.Rptr.2d 529, 851 P.2d 811, quoting *People v. Sutton* (1887) 73 Cal. 243, 247-248, 15 P. 86.)

We find no abuse of discretion.  "Facts that are within the knowledge of the defendant at the time of trial are not newly discovered even though he did not make them known to his counsel until later." (*People v. Greenwood* (1957) 47 Cal.2d 819, 822, 306 P.2d 427.)  Certainly [petitioner] would have known about the alleged debt and might have found some way to introduce the evidence at trial.  But even if that to which Valencia could testify was truly newly discovered, the trial court's ruling contains the implied conclusion that the evidence is not such that it makes a different result probable on retrial.

Evidence of a $30,000 debt might explain why Victim would have made up a story about kidnapping but it is inconsistent with Vasquez's testimony that Victim and Posadas were negotiating a drug deal during which Victim stated that he wanted to "see some money."  It also provides an alternative motive for the prosecution – [petitioner] might have kidnapped Victim to pressure him to make good on the $30,000.  Viewed that way, Victim's statement that he "put him [in] jail" would not be inconsistent with a finding that [petitioner] had kidnapped him.  Furthermore, the evidence might not have been very credible.  In deciding whether newly discovered evidence would make a different result reasonably probable, the trial court may consider credibility as well as materiality of the newly discovered evidence.  (*People v. Delgado*, supra, 5 Cal.4th at p. 329, 19 Cal.Rptr.2d 529, 851 P.2d 811.)  The trial court expressed its view of Valencia's credibility when the court asked defense counsel: "[A]re you saying that this witness that testified today [Valencia] is overwhelmingly far more credible than you believe [Victim] to be based on your review of the transcript?"  When counsel responded that he did, the court asked him, "You didn't see any inconsistencies in his testimony here today?"  Thus, even if [petitioner] could not with reasonable diligence have discovered and produced the evidence at the trial, we are not prepared to say that it is such as to render a different result probable on a retrial.  "Of that the court below was in a much better position to judge than we are." (*People v. Sutton*, supra, 73 Cal. at p. 248, 15 P. 86.)

1   (Ex. 6 at 22-25) (footnotes omitted).

2       Petitioner's claim that the Court of Appeal engaged in factfinding lacks merit.  As

3   shown, the Court of Appeal reviewed the record as to whether the purportedly new evidence

4   would have been known to petitioner at the time of trial, and made a reasonable

5   determination that petitioner himself would have been aware of a substantial part thereof, in

6   particular, the existence of any such debt and motivation; even if petitioner chose not to

7   testify, the victim could have been questioned at length on the subject.  The Court of Appeal

8   also reviewed the record as to whether the trial court abused its discretion in determining the

9   purportedly newly discovered evidence would not have rendered a "different result probable

10  on retrial," and, in so finding, noted said evidence could be interpreted in ways that both

11  supported and undermined the defense, and, further, was inconsistent with Vasquez's

12  testimony that petitioner was the buyer and the victim was the seller, not vice-versa, and that

13  petitioner appeared to owe the victim money.  Additionally, the Court of Appeal noted the

14  trial court implicitly found the newly proffered evidence lacked credibility, based on the trial

15  court's opportunity to observe Valencia, who testified during the hearing on the new trial

16  motion, and to hear what the trial court described as "inconsistencies" in Valencia's

17  testimony.

18      In sum, contrary to petitioner's claim, the Court of Appeal did not invade the province

19  of the jury.  Rather, the Court of Appeal considered various factors, as it was required to do

20  under California law, in order to determine whether the trial court abused its discretion in

21  finding the purportedly new evidence did not warrant a new trial.

22      Accordingly, petitioner is not entitled to habeas relief on this claim.

23      6.   Cumulative Error

24      Petitioner claims the foregoing asserted errors, when considered in combination,

25  resulted in prejudice.  For the reasons discussed above, the Court has found no constitutional

26  error exists, let alone multiple errors.  As there has been no error, there can be no due process

27  violation based on a theory of "cumulative" error.  See Mancuso v. Olivarez, 292 F.3d 939,

28  957 (9th Cir. 2002) (holding, where there are no errors, there can be no cumulative error).

1   Accordingly, petitioner is not entitled to federal habeas relief on this claim.

2   C.   Appealability

3   The federal rules governing habeas cases brought by state prisoners require a district
4   court that issues an order denying a habeas petition to either grant or deny therein a
5   certificate of appealability.  See Rules Governing § 2254 Cases, Rule 11(a).

6   A judge shall grant a certificate of appealability "only if the applicant has made a
7   substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the
8   certificate must indicate which issues satisfy this standard, id. § 2253(c)(3).  "Where a
9   district court has rejected the constitutional claims on the merits, the showing required to
10  satisfy     § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable
11  jurists would find the district court's assessment of the constitutional claims debatable or
12  wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

13  Here, petitioner has not made such a showing, and, accordingly, a certificate of
14  appealability will be denied.

## IV.  CONCLUSION

16  For the reasons stated above, the petition for a writ of habeas corpus is hereby
17  DENIED, and a certificate of appealability is hereby DENIED.

18  The Clerk shall enter judgment in favor of respondent and close the file.

19  Additionally, the Clerk is directed to substitute Warden Terri Gonzalez on the docket
20  as the respondent in this action.

21  The Clerk is further directed to change petitioner's address to Juan Posadas,
22  #V-91955, California Men's Colony, P.O. Box 8103, San Luis Obispo, CA 93409-8103.

23  IT IS SO ORDERED.

24  DATED: March 22, 2012

25  _____
    MAXINE M. CHESNEY
    United States District Judge

United States District Court
For the Northern District of California

26

27

28

25