United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11   JUAN POSADAS,                          )   No. C 08-4341 MMC (PR)
                                            )
12             Petitioner,                  )   **ORDER DENYING PETITION FOR**
                                            )   **WRIT OF HABEAS CORPUS;**
13        v.                                )   **DENYING CERTIFICATE OF**
                                            )   **APPEALABILITY; DIRECTIONS TO**
14   TERRI GONZALEZ, Warden,                )   **CLERK**
                                            )
15             Respondent.                  )
     _____        )
16

17        Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant

18   to 28 U.S.C. § 2254 by petitioner Juan Posadas, who proceeds pro se and challenges the

19   validity of a judgment obtained against him in state court.  Respondent has filed an answer to

20   the petition, and petitioner has filed a traverse.[1]

21                              **I.  PROCEDURAL HISTORY**

22        In 2004, a Santa Clara County jury found petitioner, with his co-defendant Maurice A.

23   Vasquez ("Vasquez"), guilty of possession of a firearm by a felon and kidnapping, the latter

24   with an enhancement for personal use of a firearm.  (CT 273-74, 279.)  Petitioner admitted

25   _____

26        [1] Petitioner initially named Michael Martel, former warden of Mule Creek State
     Prison, as the respondent in this action.  The California Department of Corrections online
27   inmate locator service shows plaintiff has been transferred to California Men's Colony
     ("CMC").  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Terri Gonzalez,
28   the current warden of CMC, is hereby SUBSTITUTED as respondent in place of petitioner's
     prior custodian.  Petitioner is reminded he must keep the Court and all parties informed of
     any change of address.

United States District Court
For the Northern District of California

1   having a prior conviction that qualified as both a prior serious felony and a prior strike.  (CT

2   278-79.)  The trial court sentenced petitioner to a term of twenty-five years in state prison.

3   (CT at 423-26.)

4        Petitioner directly appealed the judgment in the California Court of Appeal.  In

5   conjunction with the direct appeal, petitioner filed a state petition for a writ of habeas corpus.

6   (Ex. 5.)[2]  Petitioner's co-defendant, Vasquez, similarly filed a direct appeal and habeas

7   petition, and the Court of Appeal consolidated their actions.  (Ex. 6.)  On April 25, 2007, the

8   Court of Appeal affirmed the judgments against both petitioner and Vasquez, and denied

9   their habeas petitions.  (Ex. 6.)  On May 17, 2007, the Court of Appeal denied a petition for

10  rehearing and ordered various modifications be made to the original opinion, none of which

11  altered the judgment against either petitioner or his co-defendant.  (Ex. 7.)

12       On August 8, 2007, the California Supreme Court summarily denied petitioner's

13  petitions for review as filed in both the case on direct appeal and the habeas case.  (Exs. 8-

14  11.)

15       On September 16, 2008, petitioner filed the instant petition for a writ of habeas

16  corpus.

17                            **II.  STATEMENT OF FACTS**

18       The California Court of Appeal found the facts underlying petitioner's conviction to

19  be as follows:

20       *A. Introduction*

21  The jury found defendants guilty of kidnapping Guillermo Velasquez (Victim).
    Victim's story was that defendants had stopped him on the road, forced him at

22  gunpoint out of his car, bound his hands, and then forced him into their car and
    drove away.  During the short drive that followed, [petitioner] held a gun

23  pointed at Victim's rib cage and told him he wanted him to "cooperate."
    Before they had driven very far the car got stuck in the mud.  Defendants

24  ordered Victim out of the car and he managed to escape by running away
    through an orchard where he encountered a husband and wife at their residence

25  and prevailed upon them to call 911.  Victim claimed he had no idea why
    [petitioner] and Vasquez had kidnapped him.

26

27  _____

28       [2] All references herein to exhibits are to exhibits submitted by respondent in support
    of the Answer.

2

The prosecution's theory revolved around the fact that [petitioner] was a confidential informant for the Bureau of Narcotics Enforcement (BNE). The prosecution argued that [petitioner] was afraid that Victim had discovered he was an informant and, therefore, [petitioner] and Vasquez planned to kill him so that he would not reveal that [petitioner] was an informant. The defense argued that Victim was a drug dealer who had got into the car to negotiate a drug deal, that he was the one with the gun, and that when the car got stuck he ran away and made up the story about the kidnapping.

*B. The Prosecution's Case*

Victim was the prosecution's first witness. He testified through a Spanish language interpreter. Victim testified that he had met [petitioner], whom he knew as "Shorty," while the two were in jail in 2000. Victim was then serving a six-month sentence for perjury. After his release, Victim worked for [petitioner's] uncle for a few months doing landscaping. Victim had met [petitioner] on a few other occasions, as well.

[Petitioner] was a confidential informant working with BNE agents Eduard Heredia and Mitchell Fox. [Petitioner] had an extensive knowledge of the world of narcotics and methamphetamine. He first began supplying information to BNE in order to "work off a criminal case." Thereafter, he continued to supply information for cash. Heredia and Fox considered [petitioner] to be a reliable informant. On about eight to 10 occasions they had obtained search warrants in response to information [petitioner] had given them. On each occasion the agents uncovered large quantities of illegal drugs, mostly methamphetamine. Altogether, [petitioner's] tips led to the discovery and seizure of hundreds upon hundreds of pounds of methamphetamine. By the time of the incidents alleged in this case the BNE had paid [petitioner] about $30,000 for his information.

[Petitioner] did not work under the direction of the BNE agents but tended to work on his own, gathering information. The BNE never authorized him to buy or sell drugs in order to obtain information. If [petitioner] had engaged in any such transactions, it was without the knowledge of the BNE and would have subjected him to criminal penalties had his conduct been discovered by law enforcement. It was understood that the informant's identity was to remain confidential to protect both the integrity of the criminal investigations and the safety of the informant.

In or about 2001, [petitioner] told Heredia and Fox that Victim was distributing methamphetamine and was planning to manufacture it at the trailer in which he lived in a remote area of Morgan Hill. BNE investigated and learned that Victim associated with or was related to persons known to be involved in the manufacture or sale of methamphetamine. The agents also observed Victim's trailer and determined that it was located in a logical spot for setting up a clandestine methamphetamine laboratory.

In early 2003, [petitioner] and Victim drove to Fremont to meet with [petitioner's] father about landscaping work for Victim. While they were stopped a short way from their destination, a law enforcement officer approached them and searched them for narcotics. The anticipated meeting with [petitioner's] father never took place.

According to his testimony at the preliminary hearing, Victim's contacts with [petitioner] had mostly involved either the effort to obtain work or [petitioner's] interest in buying one of the goats Victim tended at the property where the trailer was located. Victim later recalled that shortly after the trip to Fremont, he had called [petitioner] to try and sell him his truck. Victim claimed that he wanted to buy a taco truck and that he needed to sell his pickup truck to pay for it. Victim made about 40 calls to [petitioner] for this purpose, 29 of those calls were made in one day on February 20, 2003.

On February 27, 2003, agent Fox and a team of law enforcement officers executed a search warrant for Victim's trailer. They uncovered nothing other than some old marijuana that Victim's aging uncle used to make a potion to rub on his joints. There was no methamphetamine and nothing to suggest that the trailer had been or was being prepared to be a methamphetamine laboratory. This was the first time Heredia and Fox had obtained a search warrant based upon a tip from [petitioner] and had not found what they were looking for.

On March 15, 2003, 16 days after the fruitless search of Victim's trailer, Victim was returning home around 6:00 or 7:00 p.m. when he saw defendants' car coming toward him. Defendants stopped their car and waved at Victim to stop, which he did. Defendants got out of their car and told Victim to come with them. Victim refused and defendants each took out a gun. [Petitioner] told Victim that Vasquez was with law enforcement. [Petitioner] reached in, turned off Victim's truck, and took the keys out of the ignition. Victim exited his truck and was told to get down on his knees. Vasquez removed Victim's belt and bound Victim's hands behind him with the belt. Defendants then ordered Victim into their car and they drove off. Victim's cell phone was left behind in his truck. Victim was in the back seat with [petitioner], who held a gun to Victim's ribs. [Petitioner] told him he wanted him to cooperate. He asked Victim why he was so scared and told him he would not be the first person he had killed.

Vasquez, who was driving, missed the ramp to the freeway and, while attempting to make a U-turn on the road that runs behind Live Oak High School, drove the car into a ditch where it got stuck. Just before getting stuck, defendants had thrown Corona beer bottles out of the car. With the car in the ditch, the trio got out and Vasquez ordered Victim to go stand by the orchard on the side of the road opposite the high school. Victim backed away toward the orchard, working his hands free of the belt as he walked. About this time a passing car had stopped by the stranded vehicle. Vasquez tucked his gun into his waistband. When he turned away from where Victim was now standing, Victim turned and ran into the orchard, by now holding his belt in his hands.

Victim soon came to a trailer where Maria Yañez was just driving up in a car. Mrs. Yañez testified that Victim had a belt in his hands. He told her that three men were chasing him with guns and asked her to call the police. She was afraid and told Victim to go talk to her husband. Jose Yañez first thought that Victim was drunk or on drugs but soon he understood that he was just "really, really frightened." He stood in the bushes frightened and crying. Mr. Yañez instructed his wife to call the police and then gave the phone to Victim. Victim reported that men were chasing him with guns.

Around the same time, Police Officer Andrew Jackson was patrolling the area around Live Oak High School when he came upon the stranded car and a truck with a winch attempting to pull the car out of the ditch. Vasquez was standing

4

United States District Court

For the Northern District of California

to one side speaking on a cell phone. [Petitioner] was pacing back and forth. As Jackson was speaking with the two men a call came over his two-way radio alerting him (and defendants) to the report of a victim being chased by persons with guns. The description of the suspects and their car matched defendants and the vehicle in the ditch. Defendants denied any involvement. [Petitioner] produced a fraudulent driver's license and murmured that he was a BNE agent. Jackson did not know what he was talking about but he could tell [petitioner] urgently wanted to get the information across to him.

Meanwhile, Sheriff's Deputy Jose Zuniga responded to the call from the Yañez residence. He found Victim "shaking, scared." He kept repeating, "They're going to get me; they're going to get me." Zuniga transported Victim to where the car was stranded and Victim identified defendants as his abductors. Jackson observed that Victim had light red linear abrasions on the outside of his wrists and "scuff marks" on the inside.

Defendants were taken into custody. A search of the area revealed a Colt .45 semiautomatic handgun in an "inside the pants" holster wedged in the fork of a tree in the orchard. The gun was loaded with a live round in the firing chamber and an extra magazine stored in the holster. When one officer announced that he had found the gun, another officer observed that defendants "slumped in their seats and slumped their heads and waved their heads." Prior to that they had been very casual, almost nonchalant. Three full bottles of beer were found placed along the fence line by the school grounds across the street from the orchard. Victim's keys were on the console in the front seat of defendants' car. His pickup truck was still parked on the side of the road leading to his trailer. No other gun was found. Police activated a recording system in the police vehicle in which defendants had been placed. The tape picked up the sound of defendants whispering to each other but much of the tape was unintelligible.

*C. The Defense Case*

[Petitioner] did not testify at trial; Vasquez did. Vasquez testified that he ran an "escort service" and had arranged for some girls to meet with [petitioner] and Victim on the night of March 15, 2003, around 7:00 p.m. Vasquez and [petitioner] drove to Victim's trailer and when he was not there they turned around and were driving away when they saw his pickup truck approaching. They all stopped. Victim left his truck and got into the car in the front seat and threw his keys on the console. Victim and [petitioner] talked together in Spanish. Vasquez could only understand a little bit of what they said but he did understand [petitioner] to ask, "[W]hy do you only have two ounces" to which Victim responded, "later" and "I want to see some money." Vasquez identified the Colt .45 holster as the holster Victim had been wearing that night.

According to Vasquez, when the car got stuck in the ditch, Victim got out, grabbed three beer bottles, walked across the street to the fence, and looked around. Then he walked back across the street to the side where the orchard was. Meanwhile, a passerby had stopped to help and, after sizing up the situation, left to get a friend who had a truck with a winch. When the person returned and Vasquez began talking with him, Victim looked agitated and then just darted off.

Rebecca Serrato, one of Vasquez's girlfriends, testified that she and two friends had planned to meet Vasquez and two of his friends at a hotel in San Martin, California, on the night the alleged kidnapping took place. She was not sure of

the exact time they were supposed to meet but it was "[b]etween 7:00 or something like that." Serrato had not yet left Sacramento when she learned that meeting would not take place. Serrato admitted to being close to Vasquez and having visited him many times in jail. The most recent visit was just two days before her testimony.

(Ex. 6 at 2-8.)

# III. DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal quotation and citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because

6

that court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.  Rather, that application must also

be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme

Court's jurisprudence.  "[C]learly established federal law, as determined by the Supreme

Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme]

Court's decisions as of the time of the relevant state-court decision." Id. at 412.  "A federal

court may not overrule a state court for simply holding a view different from its own, when

the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540

U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petitions

for review.  (Exs. 8-11.)  The Court of Appeal, in its opinion on direct review, addressed four

of the six claims petitioner raises in the instant petition.  (See Ex. 6.)  The Court of Appeal

thus was the highest court to have reviewed those claims in a reasoned decision, and, as to

those claims, it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v.

Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th

Cir. 2005).  As to the claims for which there is no reasoned opinion available, the United

States Supreme Court has recently clarified that a federal habeas court, in applying the

review provisions of 28 U.S.C. § 2254(d), looks to the result reached by the highest state

court, and the absence of reasoning does not prevent application of the standard of review set

forth in § 2254(d).  See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).

B.    Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) the trial court erred in allowing

evidence of a threat directed toward the victim by Vasquez; (2) the trial court did not allow

petitioner to cross-examine the victim with respect to the victim's purported involvement in a

1993 drug sale; (3) the trial court did not allow petitioner to cross-examine the victim with

respect to the victim's 1989 falsification of a social security application; (4) petitioner was

denied effective assistance of trial counsel; (5) the Court of Appeal engaged in fact-finding;

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    and (6) cumulative error.  The Court addresses each claim in turn.

2         1.   Admission of Evidence of Threat by Vasquez

3         Petitioner claims the trial court erred in permitting the prosecutor to ask Vasquez a

4    question about a statement he purportedly made, threatening the victim.  Petitioner

5    additionally claims the prosecutor committed misconduct in asking the question.

6         The Court of Appeal provided the background for this claim as follows:

7         At the very end of the evidence phase of the trial, the prosecutor asked Vasquez
     a series of questions concerning his conversation with [petitioner] in the back

8    of the police cruiser on the night of their arrest.  The prosecutor did not seek to
     admit the tape or the transcript of that conversation but cross-examined

9    Vasquez based upon the transcript.  Vasquez admitted saying to [petitioner],
     "What the fuck did this mother fucker run for" and "I think they think that gun

10   was ours" and other comments that were not particularly incriminating.  The
     prosecutor followed this line of questioning with this question: "When you

11   were in the proximity of [petitioner], at some point you said, 'If I get out on
     Friday, the victim's dead on Sunday'; is that correct?"  Defendants objected to

12   the question and the court sustained the objection "at this time."

13        The statement the prosecutor attributed to Vasquez was not taken from his
     taped conversation with [petitioner].  Rather, Deputy District Attorney Vonda

14   L. Tracey had filed a declaration in connection with a bail hearing, which
     stated: "On March 19, two California Department of Justice Agents contacted

15   me.  They informed me that they had visited [petitioner] in jail on an unrelated
     case.  During their conversation, [petitioner] relayed that his Codefendant,

16   Vasquez, had stated that if he (Vasquez) gets out on Friday, [the victim] won't
     be around by Sunday."  The agents to whom the declaration referred were

17   presumed to be Heredia and Fox.

18        The admissibility of the statement had been raised during in limine motions.
     The court noted then that the issue was moot unless "defendant chooses to

19   testify. . . .  [¶]  So the Court's ruling is that no mention be made of these,
     obviously in opening statement or at any other time unless the defendant

20   testifies.  Should the defendant testify and [the prosecutor] determines that he
     believes that this evidence is now relevant and admissible, he'll notify the

21   Court first and then we'll deal with the [Evidence Code section] 402 hearings."

22        Following defendants' objection to the question, the matter was discussed out
     of the presence of the jury and an Evidence Code section 402 hearing was held

23   in which Vasquez denied having made the statement.  The prosecutor
     acknowledged that he could not prove the contrary without violating

24   [petitioner's] confrontation rights.  The trial court concluded that even though
     the statement involved multiple levels of hearsay, the prosecutor seemed to

25   have a reasonable basis for it.  The court allowed the question so long as the
     prosecutor avoided mentioning [petitioner] by name.

26
          When the jury returned, the prosecutor asked Vasquez whether he had realized
27   that it was Victim who had accused him of a crime.  Vasquez admitted that he
     had and that he had been angry about that.  He also admitted whispering about

28   Victim to [petitioner] as they sat in the back of the patrol car.  The prosecutor

8

United States District Court

For the Northern District of California

then asked, "At any point had you ever said that if you get out of jail on Friday, the victim would not be around by Sunday."  Vasquez denied having made the statement and the prosecutor terminated his cross-examination.  After four brief questions from defense counsel, the evidence phase concluded.

(Ex. 6 at 8-10.)

The Court of Appeal held either version of the question was improper under California law because the questions "implied the existence of a harmful fact that the prosecutor was unable to prove."  (Ex. 6 at 10.)  The Court of Appeal also noted the prosecution's first question was in violation of "the trial court's in limine ruling . . . [and] was clearly misconduct," and "[t]he trial court compounded the error by permitting the revised version" of the question.  (Id. at 11.)  The Court of Appeal, however, did not explicitly decide whether the error was simply a state law evidentiary violation – which, under People v. Watson, 46 Cal. 2d 818, 836 (1956) would require reversal unless the error was harmless – or a violation of Petitioner's Sixth Amendment rights – which, under the more rigorous standard of Chapman v. California, 386 U.S. 18, 24 (1967), would require reversal unless the error was shown to be harmless beyond a reasonable doubt.  (Id. at 10.)  Instead, the Court of Appeal presumed a violation of defendants' Sixth Amendment rights and applied the more rigorous Chapman standard.  (Id. at 13-15.)  The Court of Appeal concluded any error caused by the prejudicial questioning was harmless beyond a reasonable doubt.  (Id.)

        a.      Confrontation Clause

Petitioner claims the trial court's ruling, allowing the prosecutor to ask the question a second time, violated his Sixth Amendment rights under the Confrontation Clause.

The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  "It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination."  Id.; see Davis v.

9

1  Alaska, 415 U.S. 308, 315-16 (1974) (noting "a primary interest" secured by the

2  Confrontation Clause "is the right of cross-examination").  The right to cross-examine, as

3  guaranteed by the Confrontation Clause, provides the opportunity to "expose to the jury the

4  facts from which jurors . . . could appropriately draw inferences relating to the reliability of

5  the witness."  Davis, 415 U.S. at 318.

6      The Confrontation Clause applies to all "testimonial" statements.  Crawford, 541 U.S.

7  at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the

8  purpose of establishing or proving some fact."  Id. at 51 (internal quotation and citation

9  omitted).  The Confrontation Clause is satisfied when the declarant is available at trial and

10  subject to cross-examination.  See Crawford, 541 U.S. at 59 n.9 ("The Clause does not bar

11  admission of a statement so long as the declarant is present at trial to defend or explain it.")

12      "Confrontation Clause violations are subject to harmless error analysis."  United

13  States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004); see also United States v. Allen, 425

14  F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the standard

15  is whether the allegedly inadmissible evidence had "'substantial and injurious effect or

16  influence in determining the jury's verdict.'"  See Hernandez v. Small, 282 F.3d 1132, 1144

17  (9th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); Webb v. Lewis,

18  44 F.3d 1387, 1393 (9th Cir. 1994) (same).

19      Petitioner's claim is without merit.  As discussed above, Vasquez was the declarant of

20  the out-of-court statement at issue and was a witness on the stand at the times the prosecutor

21  asked the questions concerning the statement.  The prosecutor asked Vasquez, "At any point

22  had you ever said that if you get out of jail on Friday, the victim would not be around by

23  Sunday?"  (RT 722.)  The question asks only about a statement by Vasquez.  It does not refer

24  to a statement by any other person.  Vasquez testified at trial and was subject to cross-

25  examination by petitioner.  Consequently, there was no violation of the Confrontation

26  Clause.  See Crawford, 541 U.S. at 59 n.9.

27      Even assuming either question violated petitioner's Sixth Amendment rights, which

28  they did not, petitioner fails to show the result of the proceedings would have been different

United States District Court

For the Northern District of California

10

1    had the questions not been asked.

2         First, the prosecution had a strong case, supported, as the Court of Appeal noted, by

3    significant physical evidence.  For example, the fact that the victim's pickup truck was left,

4    unlocked and with his cell phone in it, on the side of the road as opposed to up the hill at the

5    trailer where he lived, all indicate the victim did not voluntarily leave his truck.  Similarly,

6    the fact that the keys to the victim's truck were left on the dashboard of petitioner's car,

7    supports the prosecution's theory that the victim, fearing for his life, fled from the car when

8    the opportunity arose.  Further, the fact that the victim had abrasions on his wrist is consistent

9    with his testimony that his hands were bound, and three other witnesses testified the victim

10   was pleading for help and shaking with fear, all such evidence supporting the prosecution's

11   theory that the victim had been kidnapped.

12         Further, the first time the question was asked, an objection was sustained, and,

13   consequently, no evidence was introduced on the subject by reason of such question; the

14   second time the question was asked, Vasquez denied making the statement.  The trial court

15   instructed the jury, twice, that statements of attorneys are not evidence.  (RT 35, 746.)  The

16   trial court also instructed the jurors that questions are not evidence, and instructed them not

17   to assume to be true any insinuation suggested by a question.  (RT 35, 747.)  Additionally,

18   the court's instructions were underscored by Vasquez's own counsel in closing argument.

19   (See RT 836-37) (pointing out jurors cannot infer anything from prosecutor's challenged

20   questions).  Jurors are presumed to understand and follow instructions.  See, e.g., McKenzie

21   v. Risley, 842 F.2d 1525, 1533 & n.16 (9th Cir. 1988).  In sum, it cannot be said the

22   questions "had substantial and injurious effect or influence in determining the jury's verdict."

23    Brecht, 507 U.S. at 637.

24         Accordingly, petitioner is not entitled to habeas relief on this claim.

25              b.    Prosecutorial Misconduct

26         Petitioner claims the prosecutor engaged in misconduct by asking the initial version of

27   the question without first notifying the trial court as instructed during the hearing on motions

28   in limine.

1    Prosecutorial misconduct is cognizable in federal habeas corpus; "the appropriate

2    standard of review for such a claim . . . is the narrow one of due process, and not the broad

3    exercise of supervisory power." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal

4    quotation and citation omitted).  A defendant's due process rights are violated when a

5    prosecutor's misconduct renders a trial "fundamentally unfair."  Id.; Smith v. Phillips, 455

6    U.S. 209, 219 (1982) (noting, "the touchstone of due process analysis in cases of alleged

7    prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

8    Under Darden, the first issue is whether the prosecutor's remarks were improper; if so, the

9    next question is whether such conduct "infected the trial with unfairness." Tan v. Runnels,

10    413 F.3d 1101, 1112 (9th Cir. 2005).  In particular, a prosecutorial misconduct claim is

11    decided by "examining the entire proceedings to determine whether the prosecutor's remarks

12    so infected the trial with unfairness as to make the resulting conviction a denial of due

13    process." Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation and

14    citation omitted).

15    Here, even accepting the Court of Appeal's conclusion that the initial question was

16    improper, there is no showing the result of the proceedings would have been different had the

17    question not been asked in advance of the trial court's approval.  As discussed, the trial court,

18    upon reconsideration, did give its approval.  Moreover, as also discussed, the prosecution had

19    a strong case, and the jury was instructed that questions themselves are not evidence.  In

20    short, it cannot be said the "prosecutor's remarks so infected the trial with unfairness as to

21    make the resulting conviction a denial of due process." See Johnson, 63 F.3d at 929.

22    Accordingly, petitioner is not entitled to habeas relief on this claim.

23        2.    Exclusion of Evidence of 1993 Drug Sale

24    Petitioner claims the trial court erred in excluding impeachment of the victim in the

25    form of evidence about a 1993 incident in which the victim participated in the sale of drugs.

26    The Court of Appeal summarized the background of this claim as follows:

27        Victim had previously been charged with a Health and Safety Code violation
         that carried an enhancement for conspiring to sell more than one kilogram of
28        cocaine base.  (Health & Saf.Code, § 11370.4, subd. (a).)  At a preliminary

United States District Court
For the Northern District of California

12

hearing in 1994, BNE investigating officer, Randolph Blum, testified that he met Victim at an auto body shop on March 17, 1993, to arrange the purchase of two kilograms of cocaine at $17,000 per kilogram and also to buy Victim's Ford Mustang. According to Blum, Victim agreed to sell the cocaine on a specified future date. Victim produced 0.55 grams of cocaine and gave it to [an] informant who was acting as a translator. Indeed, the entire conversation between Victim and Blum was conducted through a confidential BNE informant. Blum spoke a little Spanish and understood the words "cocaine," "sale," and the weight under discussion. At the close of the preliminary hearing, the magistrate refused to order the prosecution to identify the informant. The charges against Victim were eventually dismissed.

Defendants wanted to introduce the transcript of the 1994 preliminary hearing to impeach Victim at trial and also to show that Victim was involved with a drug-trafficking organization. Blum was in Iraq and unavailable to testify. The prosecution objected to the evidence, arguing, among other things, that the interpreter's statements to Blum added a layer of hearsay. The trial court conducted an Evidence Code section 402 hearing at which Victim testified that he was once "involved with drugs, something like that." He admitted giving cocaine to someone. A person named "Joe" who worked at the auto body shop was interpreting for him. Victim did not remember if he gave the cocaine to Joe or to "the other guy." Victim got the cocaine from his uncle, Valencia Guadalupe, who instructed him to give it to this other person.

The trial court permitted the defense to ask Victim if he had given cocaine to a person in 1993 but refused to allow the preliminary hearing transcript into evidence, finding it contained no foundation for the skill or reliability of the interpreter. The court also reasoned that the evidence was "unduly time-consuming, prejudicial, misleading – not prejudicial, but confusing to the jury and perhaps misleading them as to what the issue is that they're supposed to decide."

(Ex. 6 at 15-16.)

Petitioner claims the trial court's ruling violated his rights to due process and confrontation. The Court of Appeal rejected such claims as follows:

In the present case, the interpreter's reliability was not evaluated at the preliminary hearing. The interpreter did not testify and there was no inquiry into his language ability, his relationship with Victim, or the circumstances surrounding his involvement in the case. Thus, the trial court had no way to evaluate whether the interpreter could be considered simply a language conduit. Furthermore, the trial court was reasonably concerned about confusing the issues. The excluded evidence coincidentally involved another BNE confidential informant who served as an interpreter for Victim. Victim had not been convicted of any crime related to the alleged transaction and there was no other corroboration of the facts the evidence was designed to prove. Thus, the jury could well have focused upon issues relating to the informant or wondered why no evidence of a conviction was ever produced.

. . .

The evidence in question was not such that its exclusion significantly altered the jury's view of the witness. The trial court permitted evidence that Victim

13

had been involved in illegal drug activity.  The BNE officer testified that Victim was known to be associated with persons involved with the manufacture or sale of methamphetamine, the court allowed defendants to ask Victim if he furnished cocaine to someone in 1993, Victim admitted having done so, and the court allowed evidence of Victim's recent perjury conviction. Thus, the jury was not deprived of evidence to show that Victim could have been involved in large drug sales or of evidence to impeach his credibility. Evidence of the alleged size of the 1993 transaction would not have provided a significantly different impression of the witness.

(Ex. 6 at 18-19.)

        a.    Due Process

        "State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (internal quotation and citation omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (holding due process does not guarantee defendant right to present all relevant evidence).  Such latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. See Holmes, 547 U.S. at 324.

        In deciding whether the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the court balances the following five factors: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense." Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004) (citing Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)).  The court also must give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based.  See Chia, 360 F.3d at 1006; Miller, 757 F.2d at 995.  Here, under the applicable Miller factors, the exclusion of the transcript of the 1994 preliminary hearing did not violate petitioner's due process rights.

        Petitioner apparently sought to introduce the transcript to impeach the victim and to show the victim was involved in drug trafficking.  The first Miller factor, probative value, arguably weighs in favor of admissibility because evidence of the victim's involvement in a prior drug sale would have placed his credibility at issue and would have bolstered

1   petitioner's defense that the victim was a drug dealer who had voluntarily entered petitioner's

2   car to negotiate a drug deal.  This factor, however, is heavily outweighed by the other four

3   factors.

4       Reliability, the second <u>Miller</u> factor, weighs against admissibility for at least two

5   reasons.  First, the reliability of the interpreter who facilitated the conversation between the

6   victim and Blum was never evaluated; thus there was no way for the jury to know whether

7   the actual conversation was consistent with the victim's statements as translated.  Second, as

8   noted by the Court of Appeal, the victim was not convicted of any crime related to the

9   alleged transaction, and there was no other corroboration of the facts the evidence was

10  offered to prove.

11      The third <u>Miller</u> factor, whether the evidence is capable of evaluation by the trier of

12  fact, weighs against admissibility for the same reasons.  The jury would have no information

13  from the translator or Blum nor any information as to why there was no evidence of

14  conviction.  This lack of context would leave many questions unanswered.

15      The fourth <u>Miller</u> factor, whether the detail was the sole evidence on the point

16  petitioner wanted to show, weighs against admissibility.  As discussed, petitioner sought to

17  introduce the evidence to impeach the victim and to expose him as someone with experience

18  in drug sales.  As found by the Court of Appeal, petitioner was able to introduce ample other

19  evidence on these points.  Specifically, BNE officer Heredia testified the victim was known

20  to be involved in a criminal organization[3], the trial court allowed defendants to ask the victim

21  if he furnished cocaine to someone in 1993 and the victim admitted having done so[4], and the

22  trial court allowed evidence of the victim's recent perjury conviction[5].

23      For the same reasons, with respect to the fifth <u>Miller</u> factor, the excluded testimony

24  was not a major part of petitioner's defense.  The 1994 transcript was hardly the sole

25  _____

26      [3]  <u>See</u> RT 351-52, 380.

27      [4]  <u>See</u> RT 130-31.

28      [5]  The perjury conviction arose from the victim's falsified application for a California
    driver's licence in 1997.  (RT 66.)  The victim was convicted in 2000.  (<u>Id.</u>)

United States District Court

For the Northern District of California

1  evidence on the victim's credibility or involvement in drug sales.

2      Finally, as discussed above, the state's case consisted of strong evidence pointing to

3  petitioner's guilt.  Petitioner thus fails to demonstrate the exclusion of the evidence "had

4  substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507

5  U.S. at 637.

6      Accordingly, petitioner is not entitled to habeas relief on this claim.

7          b.    Confrontation Clause

8      Petitioner's claim that the exclusion of the 1994 transcript limited his cross-

9  examination of the victim – in purported violation of the Sixth Amendment right to

10 confrontation – also fails.  The Confrontation Clause of the Sixth Amendment does not

11 prevent a trial judge from imposing reasonable limits on cross-examination based on

12 concerns as to harassment, prejudice, confusion of issues, witness safety, or interrogation that

13 is repetitive or only marginally relevant.  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

14 While the Confrontation Clause guarantees an opportunity for effective cross-examination, it

15 does not guarantee a cross-examination that is effective in whatever way, and to whatever

16 extent, the defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  Trial

17 judges therefore possess "wide latitude" to impose reasonable limits on cross-examination of

18 witnesses.  See Van Arsdall, 475 U.S. at 679.

19     To determine whether a criminal defendant's Sixth Amendment right of confrontation

20 has been violated by the exclusion of evidence on cross-examination, a court must inquire

21 whether:  "(1) the excluded evidence was relevant; (2) there were other legitimate interests

22 outweighing the defendant's interest in presenting the evidence; and (3) the exclusion of

23 evidence left the jury with sufficient information to assess the credibility of the witness."

24 United States v. Beardslee, 197 F.3d 378, 383 (9th Cir. 1999) (citations omitted).  A

25 defendant meets his burden of showing a Confrontation Clause violation by showing "[a]

26 reasonable jury might have received a significantly different impression of [the witness']

27 credibility had [] counsel been permitted to pursue his proposed line of cross-examination."

28 Van Arsdall, 475 U.S. at 680; Slovik v. Yates, 556 F.3d 747, 753 (9th Cir. 2009).

For the reasons discussed above, the Court finds the trial court's ruling precluding admission of the 1994 transcript was reasonable and, if not reasonable, harmless. Although the excluded evidence arguably was relevant, it was reasonable for the trial court to exclude the evidence out of concern that its admission, in the absence of a reliable interpreter, a witness on the stand, or any corroborative evidence such as a conviction, would confuse the issues by creating a mini-trial on the earlier events. Moreover, the record shows the trial court allowed the defense to introduce substantial evidence going to the victim's credibility and involvement in drug sales, including the victim's admission of a drug transaction in 1993. A reasonable jury would not have had a significantly different impression of the victim's credibility if counsel had been allowed to question him about the transcript. See Van Arsdall, 475 U.S. at 680.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

3.    Exclusion of Evidence of Falsification of Social Security Application

Petitioner claims the trial court violated his rights to due process and confrontation in excluding impeachment of the victim in the form of evidence of the victim's false application for a social security card in 1989. The Court of Appeal summarized and rejected this claim as follows:

> A probation report revealed an unadjudicated offense from 1989 in which Victim was accused of obtaining a Social Security card by giving false information. The information had not been disclosed in discovery and the defense sought to introduce it as soon as it was discovered. The trial court determined that the offense was one of moral turpitude but excluded it under Evidence Code section 352. The trial court had allowed the defense to impeach the witness with evidence of his recent perjury conviction. The court explained its ruling on the Social Security card allegation as follows: "But in light of the fact that the perjury conviction itself has been admitted and discussed in front of the jury, I don't think the additional comment that he made a false application for [a] social security card . . . would be sufficiently probative to outweigh the undue consumption of time and confusion that I believe would result from its admission in front of the jury. So on the [Evidence Code section] 352 analysis, that information is deemed inadmissible." This was not an abuse of discretion. Victim's perjury in 2000, for which he was convicted and served time in jail, was potentially far more damning of his credibility than a 15-year-old charge of falsifying a Social Security card application. The evidence was cumulative and the trial court had discretion to exclude it.

(Ex. 6 at 19) (brackets in original).

17

United States District Court

For the Northern District of California

1

    a.    Due Process

Under the applicable Miller factors, discussed above, the exclusion of the social

security evidence did not violate petitioner's due process rights.

Petitioner apparently sought to introduce the evidence to impeach the victim.  The first

Miller factor, probative value, weighs slightly in favor of admissibility.  While evidence the

victim falsified a social security card application would bear on his credibility, the probative

value of the evidence at issue here is weakened by the remoteness of the alleged offense as

well as the failure to show an adjudication of guilt.  Further, this factor is heavily outweighed

by the other four factors.

The second and third Miller factors, reliability and whether the evidence is capable of

evaluation by the trier of fact, weigh against admissibility because, as noted, the offense was

unadjudicated.  Defendants apparently sought to introduce a probation report that mentioned

the victim's having been accused, but not convicted, of the offense, leaving the jury with

little information from which to make any evaluation.

The fourth and fifth Miller factors, whether the excluded arrest was the sole evidence

on the point petitioner wanted to show and whether such evidence constituted a major part of

petitioner's defense, also weigh against admissibility.  As discussed, petitioner sought to

introduce the evidence to impeach the victim.  As also discussed, petitioner was able to

introduce ample other evidence on this point, specifically, evidence of the victim's recent

perjury conviction and evidence of the victim's involvement in drug sales.

Finally, as discussed above, the evidence against petitioner was strong.  The victim's

testimony as to the commission of a kidnapping was thoroughly corroborated by objective

evidence and independent witnesses' observations.  Petitioner thus fails to demonstrate the

exclusion of the evidence as to the application for a social security card "had substantial and

injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

Accordingly, petitioner is not entitled to habeas relief on this claim.

    b.    Confrontation Clause

Under the principles set out in Beardslee and Van Arsdall, as discussed above,

18

United States District Court

For the Northern District of California

petitioner's claim that the exclusion of the social security evidence limited his cross-examination of the victim – in purported violation of the Sixth Amendment right to confrontation – likewise fails.

For the reasons set forth above, the Court finds the trial court's ruling precluding admission of the social security evidence was reasonable, and, if not reasonable, harmless. First, evidence that a probation report showed the victim was accused of falsifying a social security application some 15 years before trial had minimal probative value with respect to his credibility. Second, it was reasonable for the trial court to exclude the evidence out of concerns as to undue consumption of time and confusion of issues. Finally, the record shows the trial court allowed the defense to introduce substantial other evidence going to the victim's credibility. A reasonable jury would not have had a significantly different impression of the victim's credibility if counsel had been allowed to question him about the social security application. See Van Arsdall, 475 U.S. at 680.

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

4.   Ineffective Assistance of Counsel

Petitioner claims his defense counsel was ineffective for failing to impeach the victim with the tape of the 911 call. The Court of Appeal summarized and rejected this claim as follows:

> Defendants point out that during the 911 call, the operator twice told Victim that police "already had" the suspects. Defendants argue that this fact is inconsistent with the evidence supplied by Officer Zuniga, which was that when he responded to the Yañez home, after the 911 call was complete, Victim was still "shaking and scared" and kept looking around, repeatedly worrying, "They're going to get me." Defendants argue that Victim's display of fear to Zuniga must have been feigned since Victim would have already been told that defendants had been apprehended. They claim that trial counsel was ineffective for failing to bring this to the jury's attention.
>
> Zuniga's observation of Victim at the scene was not recorded in a police report so that counsel probably did not anticipate his testimony. In addition, Zuniga's testimony came after Victim's. Thus, defendants concede that counsel cannot be faulted for failing to pursue the subject in their cross-examination of Victim. As defendants point out, however, Victim was subject to recall so that he could have been questioned on the point later in the trial. According to defendants, counsel should have recalled Victim to the witness stand, questioned him about the fact that he had already been told that the suspects had been apprehended when Zuniga interviewed him, and then had the transcript of the 911 call

United States District Court

For the Northern District of California

entered into evidence.  Both offer several hearsay exceptions by which the document, or portions of it, would have been admissible.  [Petitioner's] trial counsel does not recall her reasons for not introducing the 911 tape but she does recall that she did not like the fact that the transcript included a statement in which Victim identified [petitioner] by his nickname, "Shorty," as one of the perpetrators.  Vasquez's trial counsel does not address the subject.  We conclude that counsel could have had a rational tactical purpose for failing to pursue this evidence.

Since Victim is a Spanish speaker, the 911 operator was assisted by an interpreter.  During the course of the operator's questioning Victim about the specifics of his report, the interpreter asked him, "Can you see them, yes or no?"  Victim responded, "Yes, I think so."  Then the interpreter said, "Okay. Very good sir.  It seems like we already talking to them [ sic ]," to which Victim responded, "Yes."  After confirming that Victim was inside the trailer from which he had called, the interpreter then told him, "Okay, Sir, just stay there.  We already have them."  These are the statements defendants claim should have assuaged Victim's fears so that the fright he displayed when Zuniga arrived must have been an act.  However, counsel could easily have concluded that the evidence was not as damaging to Victim's credibility as defendants now claim.  If Victim had truly been as frightened as he appeared – Mr. Yañez testified that he was actually crying with fear – he might not have really understood the operator's remarks to mean that he was safe.  That is, the evidence could have cut either way.  If the jury were to interpret it as supporting the finding that Victim was, indeed, afraid for his life, recalling Victim to elicit the testimony could have done more harm than good.  Furthermore, other parts of the transcript contain information that would corroborate Victim's story: He told the operator that two men were chasing him, that they were armed, that they had tied him up with a belt, and that one of his abductors was an acquaintance he knew as "Shorty," the name by which he knew [petitioner].  Introducing the entire transcript, as defendants argue counsel should have done, would have put all of this before the jury.  It follows that counsels' failure to put this evidence before the jury was not unreasonable.

(Ex. 6 at 26-27.)

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Id. at 687-88.  Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

20

**United States District Court**
For the Northern District of California

1    A federal habeas court considering an ineffective assistance claim need not address

2    the prejudice prong of the <u>Strickland</u> test "if the petitioner cannot even establish

3    incompetence under the first prong."  <u>Siripongs v. Calderon</u>, 133 F.3d 732, 737 (9th Cir.

4    1998).  Conversely, the court "need not determine whether counsel's performance was

5    deficient before examining the prejudice suffered by the defendant as a result of the alleged

6    deficiencies." <u>Strickland</u>, 466 U.S. at 697.

7    A "doubly" deferential judicial review is appropriate in analyzing ineffective

8    assistance of counsel claims under 28 U.S.C. § 2254.  <u>See</u> <u>Cullen v. Pinholster</u>, 131 S. Ct.

9    1388, 1410-11 (2011).  The general rule of <u>Strickland</u>, i.e., to review a defense counsel's

10   effectiveness with great deference, gives the state courts greater leeway in reasonably

11   applying that rule, which in turn "translates to a narrower range of decisions that are

12   objectively unreasonable under AEDPA." <u>Cheney v. Washington</u>, 614 F.3d 987, 995 (9th

13   Cir. 2010) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).  When

14   section 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The

15   question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u>

16   deferential standard."  <u>Harrington v. Richter</u>, 131 S. Ct. 770, 788 (2011).

17   Here, there is ample support for the Court of Appeal's determination that defense

18   counsel made reasonable tactical decisions in declining to pursue the evidence.  <u>See</u> <u>Richter</u>

19   131 S. Ct. at 788.  Given all of the circumstances pertaining to the call, the 911 exchange is

20   hardly conclusive evidence that the victim was overreacting or had fabricated his story.

21   Indeed, the introduction of the evidence could well have cemented in the jury's mind

22   evidence that the victim genuinely feared for his life.  The decision was a judgment call, and

23   not one that clearly falls below an "objective standard of reasonableness." <u>Strickland</u>, 466

24   U.S. at 688; <u>see also</u> <u>Brodit v. Cambra</u>, 350 F.3d 985, 994 (9th Cir. 2003) (holding state court

25   reasonably concluded trial attorney provided effective assistance of counsel where attorney

26   declined to present evidence favorable to defense out of concern it would open door to

27   unfavorable evidence).

28   Accordingly, petitioner is not entitled to habeas relief on this claim.

21

5. <u>Fact-Finding by Court of Appeal</u>

Petitioner claims the Court of Appeal violated his right to a jury trial in its rejection of his claim on appeal that the trial court erroneously denied petitioner's motion for a new trial. More specifically, petitioner claims the Court of Appeal invaded the province of the jury by engaging in factfinding to resolve the claim. The Court of Appeal summarized and rejected petitioner's claim that the trial court abused its discretion in denying petitioner a new trial as follows:

[Petitioner] made a motion for a new trial pursuant to [Penal Code] section 1181, subdivision 8, based upon newly discovered evidence. The evidence was the testimony of Luis Valencia Mendoza, who had allegedly met [petitioner] while they both were in jail after the jury rendered its verdict in this case. The witness, who goes by the last name of Valencia, said that he was approached by [petitioner] in jail, who asked him if he was related to Victim. (Victim's full name is Guillermo Velasquez Valencia.) Valencia told him that Victim is his first cousin and [petitioner] replied that Victim was the reason [petitioner] was in jail. He [petitioner] said that Victim had lied in court and accused [petitioner] of having kidnapped him. It was then that Valencia recalled a conversation he had with Victim in October 2003 in which Victim told him that he owed someone named "Shorty" $30,000. Victim had asked Valencia if he knew Shorty but Valencia did not. Victim said, "That's the – I owe him $30,000. And, I mean, he's all over my nerves. And I don't know what to do, so I put him in jail."

Valencia was "middle" close to his cousin, Victim, and had seen him from time to time over the years. Back in 1996 or 1997, Victim had asked if he wanted to buy a gram of cocaine and gave him prices "from ounces and pounds" of both cocaine and methamphetamine. Victim also told Valencia he had once been caught selling drugs. Valencia denied that there were any male family members with the name Guadalupe Valencia, which was the name of the uncle Victim said had given him the cocaine he supplied to BNE Officer Blum in 1993.

Valencia had been incarcerated on charges of cultivating marijuana when he met [petitioner] in jail in 2005. He was given probation for the marijuana charge. He claimed to have had a prior felony conviction for discharging a firearm for which he was then on parole. He admitted to having been formerly involved in gangs and of having used drugs in the past.

Valencia had not known [petitioner] prior to meeting him in jail. He agreed to testify because it seemed to him that [petitioner] was innocent and Valencia was concerned about [petitioner's] family.

. . .

In his new trial motion, [petitioner] argued that Valencia's testimony would support the defense theory that the incident that led to his arrest was really a drug deal gone awry and that Victim had concocted the kidnapping story to put [petitioner] in prison. It also provided further impeachment of Victim. The

22

United States District Court

For the Northern District of California

1
2
3

trial court denied the motion.  The court determined that if Victim had concocted the kidnapping story because of money he owed [petitioner], [petitioner] would have known about the debt all along and, in any event, Vasquez had already testified that the entire incident involved a drug deal. [Petitioner] argues on appeal that this ruling was error.

4

. . .

5
6
7
8
9
10
11

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328, 19 Cal.Rptr.2d 529, 851 P.2d 811, quoting *People v. Williams* (1988) 45 Cal.3d 1268, 1318, 248 Cal.Rptr. 834, 756 P.2d 221.)  "In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." " ' " (*People v. Delgado*, supra, 5 Cal.4th at p. 328, 19 Cal.Rptr.2d 529, 851 P.2d 811, quoting *People v. Sutton* (1887) 73 Cal. 243, 247-248, 15 P. 86.)

12
13
14
15
16

We find no abuse of discretion.  "Facts that are within the knowledge of the defendant at the time of trial are not newly discovered even though he did not make them known to his counsel until later." (*People v. Greenwood* (1957) 47 Cal.2d 819, 822, 306 P.2d 427.)  Certainly [petitioner] would have known about the alleged debt and might have found some way to introduce the evidence at trial.  But even if that to which Valencia could testify was truly newly discovered, the trial court's ruling contains the implied conclusion that the evidence is not such that it makes a different result probable on retrial.

17
18
19
20
21
22
23
24
25
26
27

Evidence of a $30,000 debt might explain why Victim would have made up a story about kidnapping but it is inconsistent with Vasquez's testimony that Victim and Posadas were negotiating a drug deal during which Victim stated that he wanted to "see some money."  It also provides an alternative motive for the prosecution – [petitioner] might have kidnapped Victim to pressure him to make good on the $30,000.  Viewed that way, Victim's statement that he "put him [in] jail" would not be inconsistent with a finding that [petitioner] had kidnapped him.  Furthermore, the evidence might not have been very credible. In deciding whether newly discovered evidence would make a different result reasonably probable, the trial court may consider credibility as well as materiality of the newly discovered evidence.  (*People v. Delgado*, supra, 5 Cal.4th at p. 329, 19 Cal.Rptr.2d 529, 851 P.2d 811.)  The trial court expressed its view of Valencia's credibility when the court asked defense counsel: "[A]re you saying that this witness that testified today [Valencia] is overwhelmingly far more credible than you believe [Victim] to be based on your review of the transcript?"  When counsel responded that he did, the court asked him, "You didn't see any inconsistencies in his testimony here today?"  Thus, even if [petitioner] could not with reasonable diligence have discovered and produced the evidence at the trial, we are not prepared to say that it is such as to render a different result probable on a retrial.  "Of that the court below was in a much better position to judge than we are." (*People v. Sutton*, supra, 73 Cal. at p. 248, 15 P. 86.)

28

United States District Court
For the Northern District of California

1    (Ex. 6 at 22-25) (footnotes omitted).

2          Petitioner's claim that the Court of Appeal engaged in factfinding lacks merit.  As

3    shown, the Court of Appeal reviewed the record as to whether the purportedly new evidence

4    would have been known to petitioner at the time of trial, and made a reasonable

5    determination that petitioner himself would have been aware of a substantial part thereof, in

6    particular, the existence of any such debt and motivation; even if petitioner chose not to

7    testify, the victim could have been questioned at length on the subject.  The Court of Appeal

8    also reviewed the record as to whether the trial court abused its discretion in determining the

9    purportedly newly discovered evidence would not have rendered a "different result probable

10   on retrial," and, in so finding, noted said evidence could be interpreted in ways that both

11   supported and undermined the defense, and, further, was inconsistent with Vasquez's

12   testimony that petitioner was the buyer and the victim was the seller, not vice-versa, and that

13   petitioner appeared to owe the victim money.  Additionally, the Court of Appeal noted the

14   trial court implicitly found the newly proffered evidence lacked credibility, based on the trial

15   court's opportunity to observe Valencia, who testified during the hearing on the new trial

16   motion, and to hear what the trial court described as "inconsistencies" in Valencia's

17   testimony.

18         In sum, contrary to petitioner's claim, the Court of Appeal did not invade the province

19   of the jury.  Rather, the Court of Appeal considered various factors, as it was required to do

20   under California law, in order to determine whether the trial court abused its discretion in

21   finding the purportedly new evidence did not warrant a new trial.

22         Accordingly, petitioner is not entitled to habeas relief on this claim.

23         6.    Cumulative Error

24         Petitioner claims the foregoing asserted errors, when considered in combination,

25   resulted in prejudice.  For the reasons discussed above, the Court has found no constitutional

26   error exists, let alone multiple errors.  As there has been no error, there can be no due process

27   violation based on a theory of "cumulative" error.  See Mancuso v. Olivarez, 292 F.3d 939,

28   957 (9th Cir. 2002) (holding, where there are no errors, there can be no cumulative error).

24

1    Accordingly, petitioner is not entitled to federal habeas relief on this claim.

2  C.    Appealability

3        The federal rules governing habeas cases brought by state prisoners require a district

4  court that issues an order denying a habeas petition to either grant or deny therein a

5  certificate of appealability.  See Rules Governing § 2254 Cases, Rule 11(a).

6        A judge shall grant a certificate of appealability "only if the applicant has made a

7  substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

8  certificate must indicate which issues satisfy this standard, id. § 2253(c)(3).  "Where a

9  district court has rejected the constitutional claims on the merits, the showing required to

10 satisfy    § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable

11 jurists would find the district court's assessment of the constitutional claims debatable or

12 wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

13       Here, petitioner has not made such a showing, and, accordingly, a certificate of

14 appealability will be denied.

## IV.  CONCLUSION

16       For the reasons stated above, the petition for a writ of habeas corpus is hereby

17 DENIED, and a certificate of appealability is hereby DENIED.

18       The Clerk shall enter judgment in favor of respondent and close the file.

19       Additionally, the Clerk is directed to substitute Warden Terri Gonzalez on the docket

20 as the respondent in this action.

21       The Clerk is further directed to change petitioner's address to Juan Posadas,

22 #V-91955, California Men's Colony, P.O. Box 8103, San Luis Obispo, CA 93409-8103.

23       IT IS SO ORDERED.

24 DATED: March 22, 2012

25                                    MAXINE M. CHESNEY
                                     United States District Judge

*United States District Court*
*For the Northern District of California*